**Hallock v. Fatzinger**

302

C.P. of Berks County, no. 07-13733, I.D. #3.

*Danashari A. Rohlsen,* for plaintiff.
*Eric C. Diggan,* for defendant.

LASH, *J.,* January 10, 2011—The within matter is a child custody dispute. Plaintiff, Heather M. Hallock (hereinafter "mother"), seeks primary physical custody, with defendant, Corey W. Fatzinger (hereinafter "father"), to have limited supervised visitation. Father seeks partial physical custody. Trial was held on January 4, 2011. The court makes the following findings of fact:

## I. FINDINGS OF FACT

1. Plaintiff, Heather M. Hallock, is an adult individual who currently resides at 137 Douglas Road, Kutztown, Berks County, Pennsylvania 19530.

2. Defendant, Corey W. Fatzinger, is an adult individual who currently resides at 9159 Briar Edge Road, New Tripoli, Lehigh County, Pennsylvania 18066.

3. The parties are the natural parents of a minor child, Hailey Fatzinger, born April 21, 2008 (hereinafter "minor child").

4. Mother resides in the Kutztown Area School District and father resides in the Northwestern Lehigh School District.

5. At the time of the minor child's birth, the parties resided together, eventually separating on March 29, 2010, when mother obtained a temporary protection from abuse order against father, evicting him from the home.

304

6. On or about April 7, 2010, father agreed, without admission to the entry of a final protection from abuse order, with a duration of three (3) years. Within the order, custody provisions were set forth granting primary physical custody to mother, with father to have visitation supervised by father's cousin, Sarah Bologna. The supervision would take place in the home of father's aunt, Susan Burnhardt, in 3103 West Washington Street, Allentown, Lehigh County, Pennsylvania 18104. No specific times were set for the visits, which were to be arranged through Ms. Bologna.

7. Through Ms. Bologna and with mother's agreement, father began receiving supervised visits every other Thursday from 4:00 p.m. to 8:00 p.m. After father requested additional time, mother agreed to expand his time, initially to every Thursday, then to Mondays and Thursdays from 4:00 p.m. to 8:30 p.m.

8. On October 7, 2010, this court entered a temporary custody order providing, among other things, that father's supervised visits with the minor child would expand to alternate weekends from 9:00 a.m. to 6:00 p.m. on Saturday and 9:00 a.m. to 6:00 p.m. on Sunday. The visits would now be supervised by the paternal grandfather, at the home of the paternal grandparents, where father resides.

9. The incident giving rise to mother's protection from abuse petition also resulted in criminal charges being lodged against father, namely, harassment, terroristic threats, and criminal mischief. On September 21, 2010, father pleaded guilty to the terroristic threat charge. Father was sentenced to probation for eighteen (18) months, after

Lehigh County court ordered a mental health and drug and alcohol evaluation.

10. The minor child has never been enrolled in daycare. When mother is unavailable, the minor child is watched by the maternal grandmother, Virginia Hallock, or Sarah Bologna.

11. Mother is currently employed as a server at Texas Roadhouse, 6268 Hamilton Boulevard, Allentown, Lehigh County, Pennsylvania 18106, working thirty-five (35) to forty (40) hours per week, five (5) to six (6) days a week, generally from 4:00 p.m. to 11:00 p.m.

12. Father is currently employed full time, Mondays through Fridays from 7:00 a.m. to 4:00 p.m. at RHS Trucking.

13. Mother currently resides with the minor child's maternal grandparents, Virginia Hallock and William Hallock, as well as the minor child.

14. Father currently resides with the minor child's paternal grandparents, Alden and Ruth Fatzinger. The house has a separate bedroom for the minor child.

15. Father has attended Valley Counseling Group, LLC, in Bethlehem on a weekly basis, recently graduating, for issues involving anger management and domestic violence. The counseling also discussed parenting concepts within the therapeutic context.

16. The parties stipulate that mother shall retain primary physical custody and the parties will share legal

custody.

## II. DISCUSSION

In making disposition, this court considered the testimony of the parties, the intermediary and father's cousin, Sarah Bologna, friends of the parties, Adam Frey, and his fiancee, Elizabeth Everett, father's former girlfriend, Gretchen Duke, a friend of father's, Roy Grube, Jr., the maternal grandmother, the paternal grandparents, and the exhibits submitted into evidence.

Mother seeks to restrict father's access to the minor child with appropriate supervision, citing three (3) predominate reasons. First, mother is concerned about father's temper, that he may have a capacity to lash out at the minor child when she is misbehaving or having a tantrum. Second, mother is afraid that father will take the minor child from her and move to some undisclosed location, based upon threats that he had made. Third, she believes that father does not have the capacity to properly care for the minor child.

Regarding her first concern, mother alleged that father maintained a pattern of emotional abuse toward her, making threats and acting in a controlling and demeaning manner. This culminated in the incident on March 29, 2010, which resulted in her obtaining a protection from abuse order. At that time, mother alleged that father, while intoxicated, threatened to kill her on several occasions, made specific and dire threats regarding killing her three-(3) year-old nephew, grabbed her by her neck, dragged her through the rooms of the house, and destroyed property,

including her car radio and the bathroom door. While this may have been the most extreme incident, father, according to mother, during the course of their relationship, would get angry with her, threaten to kill her, curse at her and call her disparaging names. He would occasionally place his rifle nearby, or hand her a bullet, to menace her. He would withhold her cell phone so that she could not contact others and would watch her wherever she would go, resulting in her deciding to leave the house only to go to work or to the store. On one occasion, during an argument, father pointed a gun, which mother described as a rifle, toward his face or mouth and told her that they were going to play "truth or dare." He would ask her questions and stated that if he did not like her answers, he was going to pull the trigger, impliedly stating he would kill himself. Friends who were present for the get-together leading up to the incident then intervened. Mother testified that she was also menaced by a "shrine" father constructed when he returned to the house to obtain his clothing soon after the protection from abuse order was lodged. The shrine included photographs of the parties and memorabilia of good times they had together.

Mother stated that father, on several occasions during the course of an argument, threatened to take the minor child and leave. On one occasion, while mother was still breastfeeding the minor child, father stated he was moving to Florida. Mother believed these threats to be credible.

Mother also believes that father is incapable of properly tending to the daily needs of the minor child. While the parties resided together, mother provided all the daily care. Although father was not employed, he nevertheless

preferred to leave the house and spend time with his friends, rather than help with the caretaking of the minor child. Mother was forced to use babysitters during her work hours. Father did not participate in the minor child's medical checkups. Further, mother believed that father had no interest in the caretaking responsibilities, actually preferring to allow a third person to watch the minor child when mother was at work. His lack of interest also surfaced during the scheduled supervised visits, as mother stated that father would consistently be an hour or more late for a four-(4) hour visit.

Upon cross-examination, mother conceded that she believes father loves the minor child and would not do anything to harm her. Accordingly, her apprehension that father would overreact to the minor child misbehaving may have been overblown. She remains steadfast, however, about her concern that father may leave with the minor child and that father lacks the requisite parenting skills.

Father states he has a great love and affection for the minor child and wants to see her "as much as possible." He has recently begun working full time, resulting in him being available for weekends. However, once his schedule is set, if he has available weekdays, he would like to have weeknights with the minor child as well.

Father argues that he should not be required to have his visits supervised by his father or any third party. He admits to some of the allegations testified to by mother, but also states that he has made strides to change his behavior. He testified that he spent a short time in jail after

being arrested on charges stemming from the March 29 incident. During his stay in jail, he had time to reflect, and decided that it was time for him to make some changes. Upon his release, he made inquiries to his attorney about anger management counseling. His attorney referred him to the Valley Counseling Group, LLC, where he received anger management and domestic violence counseling. He attended about seven (7) sessions with some additional follow-up. The counselors instructed him on the damage his destructive behavior can cause for himself and his family. They provided him with methods to alleviate stress and address his anger. His testimony was specific and informed, establishing that he has embraced the lifestyle changes presented to him by the counselors.

Father also testified that some of mother's allegations were exaggerated. Regarding the March 29 incident, he admits that he was intoxicated, that he was involved in a heated argument with mother, and that he intentionally damaged her car radio and the bathroom door. He denies making any threats to kill her or her nephew. He admits to pleading guilty to terroristic threats, but stated he had to do so because if he went to trial, his attorney advised him he would likely be convicted and could face additional jail time.

Father urged that he has never and would never harm the minor child in any way. He admits making a statement on one (1) occasion that he was going to flee to Florida with the minor child, but he never intended to do this, making the statement in the heat of the moment. He denies any physical abuse, and also denies using his gun as a

menace, stating that he always kept the gun unloaded and secure. While it was in plain view for a period of time, he agreed, at mother's suggestion, to place it in a closet. Regarding the "truth or dare" incident, father states he was merely playing around. He agrees that his actions were inappropriate, but he never intended to harm himself nor anyone else. Further, he insists that the gun involved was a pellet gun, not his rifle.

Father states that he wanted to have more involvement with the minor child, but mother made this difficult. In particular, after the parties' separation, father consistently requested additional time, but mother was very reluctant, always requiring supervision.

Father argues that mother was a very active participant in the arguments between the two (2), often being intoxicated as well. He said her personality was like "Jekyll and Hyde," that sometimes she would be very easy to live with, but other times she acted out, causing him to want to leave the house. Further, while he states that mother is a good mother in many respects, he questions some of her parenting methods.

The paramount concern in a child custody proceeding is the best interests of the child. *Costello v. Costello,* 666 A.2d 1096, 1098 (Pa. Super. 1995). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton,* 659 A.2d 1040, 1042 (Pa. Super.

1995).

We also note the longstanding law that states that an award of partial custody should generally not contain any restrictions. However, restrictions may be imposed when the party requesting the restrictions shows that without it, partial custody will have a detrimental impact on the child. Even so, restrictions must be phrased in the least intrusive language reasonably needed to safeguard the child. *Fatemi v. Fatemi*, 489 A.2d 798, 801 (Pa. Super. 1985).

It is apparent that both parties attempted to present themselves in the most favorable light possible, substantially downplaying their level of fault in the acrimony between them. Both parties exhibit a substantial level of immaturity.

In day-to-day situations, each tended to react or respond to their own concerns, without empathy for the other person.

Father has exhibited a lack of discipline, resulting in him being unable to make strong commitments to work, to a relationship, or to providing proper parenting. It appears that he would rather relax, spend time with his friends, and only work when necessary, rather than do the heavy lifting required of a responsible adult and parent. He exhibited certain personality inadequacies, which manifested in a bullying nature toward mother. He also exhibited a need to "talk big," a technique he employed to attempt to "control" mother's actions.

That being said, there has been progress. This court

believes father when he states that his arrest and the ramifications that went with it were a watershed moment. He faced a loss of freedom. He has been limited in seeing his minor child since that incident. His seeking counseling appears to have been in earnest and has borne fruit. While some of the negative aspects of his character remain, it appears he is moving in the right direction. If he loves his child as much as he says, his commitment to positive growth for his own sake and for the minor child will have to continue. This would mean maintaining consistent employment, hopefully with the same company, paying taxes, recognizing mother and other women as equals, continuing to abstain from alcohol and controlled substances, and incorporating proper parenting methods into his relationship with his minor child.

Regarding mother, her presentation and allegations against father initially makes one question why she would have continued in this relationship for any length of time, much less attempt to start a family. However, ultimately, it appears that mother's experience was not quite as horrific as it first sounded. For one, mother admitted positive experiences in the relationship. Further, mother has a capacity for the dramatic. It also appears she was an active participant in the altercations, sometimes being the catalyst.

On the other hand, mother made every attempt to provide a suitable home for the minor child. She was both the homemaker, providing the daily needs for the minor child, and the breadwinner, working full time while father remained unemployed. Fortunately, mother had relatives

who were willing to pitch in and help care for the minor child while mother was working and father had other plans.

This court is satisfied that the evidence does not support the conclusion that father would cause any harm to the minor child. It is also unlikely that he would relocate from the jurisdiction; however, in an abundance of caution, this court shall include in its order a writ of ne exeat restricting father from leaving Pennsylvania with the minor child without the agreement of mother or further order of court. Regarding his parenting capacity, due to mother's mistrust of him and his own recalcitrance, he has no track record. While, as stated, he has matured and, apparently learned from his mistakes, he is nevertheless a work in progress. His skills will need to develop. The presence of his parents can assist in this regard.

Accordingly, we find that the level of supervision previously insisted upon by mother, that father cannot be alone with the minor child, is not warranted. However, a lower level of supervision, whereby the paternal grandparents continue to be available to assist him in the caretaking responsibilities, until father can satisfactorily establish himself, would be appropriate. As long as father resides with the paternal grandparents, the oversight should be satisfactory. We enter the following order:

## ORDER

And now, January 10, 2011, after trial held, custody of the parties' minor child, Hailey Fatzinger, born April 21, 2008, (hereinafter "minor child"), shall be as follows:

1. The parties shall share legal custody of the minor child.

2. Plaintiff, Heather M. Hallock (hereinafter "mother"), shall have primary physical custody of the minor child.

3. Defendant, Corey W. Fatzinger (hereinafter "father"), shall have partial custody of the minor child on alternate weekends from Saturday at 9:00 a.m. to Sunday at 6:00 p.m., provided that father continues to reside in the home of the paternal grandparents. If father decides to relocate, this order may remain in place if agreed to by the parties. Otherwise, the matter may be scheduled for a review by the court.

4. Father may have partial custody at such other times as the parties may agree.

5. The parties shall each have the right of first refusal. If the custodial parent is unavailable to care for the minor child for a period of more than two (2) hours, the custodial parent shall contact the other parent to determine whether the non-custodial parent wants to watch the minor child in the custodial parent's absence.

6. Mother shall have mother's day each year and father shall have father's day each year from 9:00 a.m. to 6:00 p.m.

7. The parties shall alternate the following named holidays, with mother to have the first holiday after the date of this order, from 9:00 a.m. to 6:00 p.m.: Easter, Memorial Day, July 4th, Labor Day, and Thanksgiving.

8. Regarding the Christmas holiday, the parties shall alternate the schedule, such that in odd-numbered years, mother shall have custody from Christmas Eve at 1:00 p.m. to Christmas Day at 1:00 p.m., then father shall have Christmas Day at 1:00 p.m. to December 26 at 1:00 p.m., with the schedule to reverse on even-numbered years.

9. The holiday schedule shall take precedence over the regular custody schedule.

10. Father shall not be permitted to remove the minor child from the Commonwealth of Pennsylvania without written agreement of mother or further order of court.

11. The attached appendix shall be made a part of the within order.

12. This order shall be considered a final order finally resolving the issues raised in the complaint filed by mother.

## APPENDIX TO ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on both parties, the breach of which could become the subject of contempt proceedings before this court, or could constitute grounds for modification of this order. If these general rules conflict with any specific provisions of the order, the order shall prevail.

1. In addition to the foregoing rights, both parties shall also have the following rights with respect to the child:

A.   The right to reasonable telephone contact with the child when he or she is in the other parent's custody.

B.   The right to be fully informed concerning the progress of the child in school and the child's medical status, including the right to obtain the necessary information directly from the child's school or medical practitioner; and

C.   The right to be informed in advance before any important decisions are made concerning the child and the opportunity to participate in those decisions.

2.   In the event of any serious illness of the child at any time, any party then having custody of the child shall immediately communicate with the other party by telephone or by any other means, informing the other party as to the nature of such illness, and during such illness, each party shall have the right to visit the child as he or she desires consistent with the proper medical care of the child.

3.   Neither party shall alienate nor permit to attempt to alienate the child from the other party. While in the presence of the child, neither parent shall make any remarks or do anything which is derogatory or uncomplimentary to the other and it shall be the duty of each parent to uphold the other parent as one the child should respect and love.

4.   Both parties shall provide each other with their addresses and telephone numbers of their residences and anytime they take a trip with the child out of the jurisdiction

of Berks County in excess of three (3) days.

5. The parties shall not conduct arguments or heated conversation when they are together in the presence of their child.

6. The parties shall, at all times, consider the child's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying to desperately cope with the fact of his or her parents' separation, and needs help in loving both parents, rather than interference or censure.

7. Neither party shall question the child as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the child. By this we mean that the child will not be used as a spy on the other party. It is harmful to a child to be put in the role of spy.

8. The parties should remember that they cannot teach their child proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

9. Weekend and evening visitation shall be subject to:

A. Arrangements will be worked out before hand between the parties without forcing the child to make choices and run the risk of parental displeasure. However, the child shall be consulted as to his or her schedule when appropriate.

B.   Visitation rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the need and desire of the minor child.

C.   If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the child to unnecessary apprehension and failure of expectations.

D.   The party having custody of the child should prepare him or her both physically and mentally for the transfer of custody to the other party and have him or her available at the time and place mutually agreed upon.

E.   If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the child.

F.   If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

10.  If either party feels the other party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.